## No. 30,272.

·C. C. TAWZER, *Appellee*, v. JAMES McADAM et al., *Appellants*.

(7 P. 2d 516.)

Opinion filed January 30, 1932.

*Howard Rooney*, of Dodge City, and *Charles Rooney*, of Topeka, for the appellants.

*Carl Van Riper*, of Dodge City, and *O. G. Underwood*, of Greensburg, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action to recover sums of money alleged to be due the plaintiff for wheat delivered to defendants in the years 1927 and 1928.

Plaintiff was a farmer in Clark county. Defendants operated a public elevator and were engaged in buying and selling grain in Minneola. In the summer of 1927 plaintiff made arrangements with defendants to deliver his wheat crop at their elevator. The first of the main questions in this lawsuit pertains to the terms under which that crop was delivered. In 1928 plaintiff delivered his wheat crop for that year to defendants. His sons and others of his family made similar deliveries of wheat to defendants on the same terms—whatever those terms were. Plaintiff has acquired by assignment the claims of his sons and these others against defendants and sues thereon in his own name. The second main question in this lawsuit relates to the terms on which these deliveries of wheat in 1928 were made.

In his petition plaintiff alleged that defendants agreed to pay the "door price," which was the price defendants paid at their elevator in Minneola for wheat of like kind and quality, at any future date plaintiff should choose to sell. Plaintiff alleged that in the exercise of that right he did elect to sell his 1927 crop of wheat on April 28, 1928. On that date defendants were paying $1.75 per bushel at their elevator for wheat of like quality.

Concerning the wheat deliveries during the season of 1928, plaintiff alleged that he elected to sell on February 15, 1929, on which date the door price at Minneola was $1.08 per bushel.

Plaintiff's causes of action were formally set out in nine counts, which we summarize thus:

Wheat deliveries for 1927:
    (1) C. C. Tawzer.................. 325 bu. 30 lbs. at $1.75 per bushel
    (2) Frank Tawzer................. 367 bu. 50 lbs. at 1.75 per bushel
    (3) H. L. Tawzer.................. 236 bu. 30 lbs. at 1.75 per bushel
    (4) Mrs. L. R. Tawzer............ 103 bu. 30 lbs. at 1.75 per bushel
Wheat deliveries for 1928:
    (5) C. C. Tawzer.................. 4,642 bu. 50 lbs. at $1.08 per bushel
    (6) Frank Tawzer................. 3,501 bu. 0 lbs. at 1.08 per bushel
    (7) W. J. Tawzer................. 1,212 bu. 20 lbs. at 1.08 per bushel
    (8) Clark Tawzer................. 308 bu. 40 lbs. at 1.08 per bushel
    (9) H. L. Tawzer.................. 1,276 bu. 30 lbs. at 1.08 per bushel

Plaintiff alleged that on the first four causes of action payment to the amount of $602 had been made, leaving a balance due thereon in the sum of $1,206.61 with interest thereon since April 28, 1928. He also alleged that on the next five causes of action the sum of

$5,861.90 had been paid, leaving a balance due thereon in the sum of $5,951.27 with interest since February 15, 1929.

Defendants answered with a general denial verified on the best of their counsel's information and belief. Included in the answer were allegations of payments on plaintiff's account made at his instance and request, also of a loan to plaintiff and default of repayment.

The cause was tried before a jury. Plaintiff's testimony tended somewhat hazily to support the allegations of his petition. Defendants' testimony was quite the contrary. The jury were not required to render a general verdict, it being agreed by counsel that the court might make a general finding and judgment upon the pleadings and evidence and upon the answers to three special questions submitted to the jury. These questions and the answers read:

"1. Did plaintiff notify defendants' agent, Mr. Kirk, on April 28, 1928, that he was selling his 1927 wheat that day? A. Yes.

"2. Did plaintiff notify defendants' agents, Mr. Kirk or Mr. Boucher, on February 15, 1929, that he was selling his 1928 wheat that day? A. Yes.

"3. Did the contract between plaintiff and defendants provide that plaintiff should receive the door price or the option price for his 1928 wheat? A. Door price."

The trial court approved the jury's special findings and rendered judgment in favor of plaintiff for $6,429.83, and gave a Minneola bank, intervener, a lien on the judgment—a detail of no present concern.

Defendants appeal, assigning error, (1) on the court's restriction of their cross-examination of plaintiff, (2) on the exclusion of evidence offered by defendants, and (3) on the presence of the presiding judge in the jury room and a conversation there held between him and the jurymen while they were deliberating on their verdict.

As the last of this assignment appears the most formidable, it will be considered first. In support of the motion for a new trial one of the jurors testified, in part, thus:

"During the consideration of the case in the jury room, the jury requested the bailiff to summon the court to them. The court [judge] did, thereafter, come to the jury room. He just stuck his head in through the door. He was not completely in the room, but was in view of anyone who chose to look in his direction. At that time, one of the jurors asked him if the 1927 wheat crop had been settled for. He said that certain stipulations had been agreed upon between the lawyers and the parties to the suit which covered the settlement, and so far as we are concerned the settlement had been made, that we had nothing to do with the settlement, but it was according to the stipulations the crop had been settled for. . . .

*"Cross-examination:*

"The juror who asked the judge the question was Mr. Evans. None of the questions which the jury was to answer had been answered at that time, nor had any of the answers been agreed upon at that time. Mr. Evans wanted to know if the 1927 wheat crop had been settled for in full. The one particular member of the jury had said that he couldn't feel disposed to vote on any of the questions until he was satisfied as to the disposition and settlement of the 1927 crop."

*"Redirect examination:*

". . . It was argued by one of the jurors that if the 1927 wheat crop had not been settled for that it would be improbable that the 1928 crop would have been delivered by the plaintiff to the defendants."

*"Recross-examination:*

"It was argued in the jury room that because the 1928 crop was delivered, a settlement for the 1927 crop had probably been made."

The fact of this occurrence was not denied. Counsel for the litigants dictated into the record the following:

"It is hereby stipulated by attorney for defendants, . . . and attorney for plaintiff, . . . that in respect to the conversation between the court and the jury testified to by the witness Price that they had no notice that said conversation was to take place or that the court was going to converse with the jury in the jury room and that they were not present at that time."

The statute which provides for the seclusion of the jury from all communication with any person other than their own membership is quite strict and specific. It reads:

"When the case is finally submitted to the jury, they may decide in court, or retire for deliberation. If they retire, . . . The officer having them under his charge shall not suffer any communication to be made to them, or make any himself except to ask them if they are agreed upon their verdict, unless by order of the court; and he shall not before their verdict is rendered communicate to any person the state of their deliberations, or the verdict agreed upon." (R. S. 60-2911.)

The only pertinent exception to the foregoing statutory rule deals with the jury's possible desire to be further informed on the law or the evidence, in which case the jury should be brought into court and counsel for the litigants notified and given an opportunity to attend. The statute reads:

"After the jury have retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given in writing, or the evidence shall be read or exhibited to them in the presence of, or after notice to, the parties or their counsel." (R. S. 60-2913.)

In view of these statutory provisions it was altogether irregular for the presiding judge to go to the jury room and hold conversation with members of that body while they were deliberating on their verdict. It was highly improper to do so touching any aspect of the case under consideration in the absence of counsel for the litigants. The law books are laden with decisions holding that such departure from correct practice constitutes reversible error. In 38 Cyc. 1827, the rule is thus stated:

"It is improper for the judge to go into the jury room even though he has no speech with them. He has no more right in the jury room while the jury are deliberating than any other person. According to some decisions, this is of itself sufficient ground to reverse the judgment, although there is authority to the contrary."

In 20 R. C. L. 257 it is said:

"It is well established that any communication between the judge and jury after they have retired to deliberate upon the verdict, except in open court, is improper. In some cases the strict rule is maintained that if the judge enters the jury room in the absence of the attorneys, even at the request of the jurors, after they have retired to deliberate on their verdict, and has any communication or conversation with the jury in reference to the case, a new trial will be granted, without consideration of the question whether such conversation was prejudicial or not; and the same is true if additional instructions or other communications are sent to the jury room without the consent of, or notice to, parties or counsel. According to other authorities, however, while the practice of communicating with the jury under such circumstances is discouraged, a new trial will not be granted if it appears that no prejudice resulted or could have resulted therefrom."

In our own early case of *Stager v. Harrington,* 27 Kan. 414, there had been a jury trial before a justice of the peace, and after the jury retired to consider their verdict the justice entered the jury room, in the absence of the parties and their counsel, and gave to the jury instructions. This court condemned such practice:

"Where a case is tried before a justice of the peace and a jury, *held,* that it is error for the justice to even enter the jury room in the absence of the parties and their counsel, and while the jury are deliberating upon their verdict; and his giving instructions to the jury under such circumstances increases the error; and if he gives other instructions in addition to those given to the jury before they retired to consider their verdict, the error is still greater." (Syl. ¶ 5.)

The recent case of *State v. Scholl,* 118 Kan. 629, 236 Pac. 816, was a prosecution for the felonious receiving of stolen property. The theft had been that of a steer. The stolen animal was shot and the defendant received the carcass, not the steer. The jury had

some trouble with subtleties of law suggested by that state of facts, so after deliberating on their verdict for many hours, they signified their desire for further information. The jury were brought into the jury box and the first conversation between the jurors and the judge was held in the court room and in the presence of the attorneys for the parties. Indeed, one of the attorneys for defendant participated in the conversation and asked questions. After the jury retired to resume their deliberations the trial judge went to the door of the jury room several times and held conversation with them. When a motion for a new trial was presented, based partly on the foregoing incident, the judge made a statement, which appears in a five-page opinion in volume 4, Briefs, 118 Kan. (case No. 25,613), files of Kansas state library, in which it was convincingly shown that nothing actually prejudicial occurred. That statement of the judge had the force of evidence (*Cazzell v. Cazzell*, 133 Kan. 766, 768, 3 P. 2d 479), so in deference to the mandate of the criminal code (R. S. 62-1718) this court was constrained to affirm the judgment of conviction, but we were careful to say:

"The conduct exhibited was, however, highly improper. Throughout the proceeding in a criminal case the trial judge's place is on the bench. The jury room is a place of seclusion and privacy for members of the jury while they are deliberating on their verdict. The trial judge has no privilege to invade it, and all his communications with the jury ought to be in open court." (*State v. Scholl*, 118 Kan. 629, 635, 236 Pac. 816.)

In the instant case it is apparent, we think, that a persuasive inference touching the truth or falsity of the alleged contract between these litigants for the wheat crop of 1928 would be drawn from the fact and character of any settlement they made as to the wheat crop of 1927; and the jurors could hardly fail to be influenced by the judge's conversation with them on that point in the jury room. This court therefore feels bound to hold that the incident complained of was prejudicially erroneous.

Touching the restriction placed upon the cross-examination of the plaintiff, who was the principal witness in his own behalf, a perusal of the record suggests that defendant's complaint thereat is well founded. It appears to be a custom of the grain trade to buy future options to protect the trader against any turn of the market which would affect him adversely when he had obligated himself as plaintiff alleged that defendants had done in their dealings with him. Plaintiff had testified that he did not "understand anything about this option."

On cross-examination defendants naturally desired to show that plaintiff was not so innocent of the ways of grain trade as he had just professed. The record reads:

"Q. You have made other transactions on the board of trade?"

[COUNSEL FOR PLAINTIFF]: "Object to that as not proper cross-examination.

"THE COURT: Sustained.

"Q. You are familiar with speculating on the wheat market?"

[COUNSEL FOR PLAINTIFF]: "Object to that as not proper cross-examination.

"THE COURT: Sustained."

To show that plaintiff had elected to sell the 1927 wheat crop on April 28, 1928, plaintiff testified to a conversation he had with R. E. Kirk, manager of defendant's elevator:

"I was in front of the drug store at Minneola, and he and some other parties were sitting on the running board of a car. I said, 'Well, Rome, let's go down and settle for that wheat.' He said, 'Go see Mr. McAdam. He wants to settle for that wheat.' I couldn't say anything only say it was all right. He told me Mr. McAdam was out of town at that time. There was nothing definitely said about the price of wheat between myself and Mr. Kirk at that time. He did tell me he was paying $1.75 a bushel for good wheat. I don't remember that I saw Mr. McAdam very soon after that. . . .

"I never told Mr. McAdam I had selected a day to settle for this wheat. On the 28th day of April, I saw Mr. Kirk at the elevator before I talked to him on the street in the front of the drug store. We talked about the price of wheat, and I knew at that time that I was going to pick that day to settle for the 1927 wheat, but I did not tell him at that time. I don't know why I didn't tell him at his place of business that I was going to sell the wheat on that day. . . .

"I considered that I had sold this wheat on February 15, 1929. I saw Mr. McAdam a few weeks after April 28, 1929, [1928?] . . We talked a half a day and never got the price set. Mr. McAdam was just smooth enough to head me off whenever I came up to it. I finally went home to dinner."

*Cross-examination:*

[COUNSEL FOR DEFENDANTS]: "Defendant now requests leave of the court to cross-examine the plaintiff, Mr. Tawzer, in regard to wheat transactions, to ask the witness, Mr. Tawzer, for what reason he did not take the cash for wheat on the days of delivery, and further, to ask the witness if it wasn't a fact that he was speculating on his wheat."

Objection sustained.

"Q. Now, at this time, you said Mr. McAdam smoothed you out, Mr. Tawzer; at that time, you owed McAdam more money than your wheat was worth, didn't you?"

[COUNSEL FOR PLAINTIFF]: "Object to that as immaterial and not proper cross-examination.

"THE COURT: Sustained."

It is unnecessary to quote further excerpts from the record to show the narrow limits within which the trial court sought to confine

the cross-examination of plaintiff. This court is aware that it is not urged as error that there was no substantial evidence to support the special findings and judgment, consequently the abstract may not contain all the evidence on that point. But according to plaintiff's own testimony, Kirk, the manager, being away from his place of business and perhaps off duty, disclaimed authority to accept a notification from plaintiff that he was electing to sell his 1927 wheat crop on April 28, 1928. If Kirk had assumed to act probably his employers would be bound. But he declined to act, disavowed authority, and told plaintiff he would have to see McAdam. Plaintiff acquiesced in Kirk's attitude. He testified, "I couldn't say anything only say it was all right." But he did not promptly follow up Kirk's suggestion. He testified, "I don't remember that I saw Mr. McAdam very soon after that. . . . I saw McAdam a few weeks after April 28, 1928. We talked a half a day and never got the price set. Mr. McAdam was just smooth enough to head me off whenever I came up to it." In view of this sort of a story to prove plaintiff's election to sell his wheat crop of 1927 on April 28, 1928, a searching cross-examination of this witness was not only justified but imperative if the danger of a gross miscarriage was to be averted. It is no answer to defendants' complaint touching the restrictions placed upon the cross-examination of plaintiff to say that the questions sought to elicit matters not touched on in plaintiff's direct examination. The case was bound to turn largely on the credence the jury would attach to the testimony of plaintiff. For that reason defendants were entitled to discredit plaintiff's testimony in his own behalf by a searching cross-examination—if they could. (*McIntosh v. Oil Co.,* 89 Kan. 289, 131 Pac. 151, 47 L. R. A., n. s., 730 and note; *Zinn v. Updegraff,* 113 Kan. 25, 213 Pac. 816; *Reeser v. Hammond,* 122 Kan. 695, 253 Pac. 233.) It is a salutary rule of trial practice that when a party is a witness in his own behalf, and where the issues of fact must largely turn on the credence which the triers of fact will give to his testimony, the fullest inquiry should be permitted on cross-examination to discover not only the accuracy of his understanding, but his memory and his credibility as well. To that end he may be cross-examined on collateral matters which may throw light upon the matters in issue.

In *Jansson v. Larsson,* 30 App. D. C. 203, the rule is thus stated:

"Wider range of cross-examination of a witness is allowable where he is a party to the proceeding than if he is not." (Syl. ¶ 3.)

In *Shores v. Simanton*, 99 Vt. 191, it was said:

"Great latitude is allowed in cross-examination, especially of a party who testified in his own behalf, in testing weight to be given his testimony." (Syl. ¶ 11.)

In *McManus v. Mason*, 43 W. Va. 196, the rule was thus stated:

"Where the defendant appears as a witness in his own behalf, the plaintiff has a right to so cross-examine him as to elicit any facts which would in any way tend to corroborate the testimony of plaintiff, or contradict that of defendant." (Syl. ¶ 2.)

In *Ingles v. Stealey*, 85 W. Va. 155, 158, it was said:

"A party to a suit may, on cross-examination, be questioned in regard to any matter pertinent to the issue, whether he testified thereto in his evidence in chief or not."

In accord with the foregoing are: *Jaffe v. Deckard* (Tex. Civ. App.), 261 S. W. 390; *Burns v. Johnston*, 38 N. Y. Supp. 978; *Ward v. Thompson*, 146 Wis. 376; 28 R. C. L. 609.

Touching the error urged in the exclusion of evidence offered by defendants to show the customary practice in the grain trade to buy future options to protect against the sort of contracts alleged to have been made between plaintiff and defendants for the 1927 and 1928 wheat crops, we think appellants' complaint is well taken. Defendants' proffered testimony on that point was competent, and they should have been permitted to cross-examine plaintiff along the same line. On this point the case of *Security National Bank v. West*, 120 Kan. 434, 243 Pac. 1014, is instructive. That action was by the bank to recover on defendant's note. One of the defenses was want of consideration, and the business dealings of defendant with the president of the bank were gone into at some length. The plaintiff bank sought to elicit from defendant on cross-examination how he expected his money in the bank was going to earn for him six or seven per cent if it was to be left idle in the bank. The trial court would not permit him to be thus cross-examined. This court held that the questions propounded were proper to test the good faith of defendant's story, and that notwithstanding the general rule that the extent to which a witness may be subjected to cross-examination is controllable by the trial court's discretion, the restriction placed thereon in that case constituted prejudicial error. This court holds that the evidence to show the custom of the grain trade to buy options to protect against the sort of contracts which plaintiff alleged he had made with defendants was competent and proper, not only

for defendants to adduce in their own behalf, but that it could also be elicited on cross-examination of plaintiff to minimize or controvert his testimony that he did not understand that sort of practice, and to test the good faith of the story whereby he hopes to collect a large sum of money from these defendants.

The judgment is reversed and the cause remanded for a new trial.

HARVEY, J., not sitting.